UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

SECURITIES AND EXCHANGE COMMISSION,       :

                              Plaintiff,       :        03 Civ. 2937  (WHP)

                 -against-                      :        MEMORANDUM AND ORDER

BEAR, STEARNS & CO. INC.,                   :

                              Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

Six years after the Securities and Exchange Commission's ("SEC") much-heralded announcement of the "Global Research Analyst Settlement," more than $79 million intended for aggrieved investors cannot be distributed and continues to accrue interest.  This predicament should have been anticipated by the parties prior to bringing these cases and the proposed consent judgments to Court.  The quandary of what to do with undisbursable funds presents cautionary lessons for regulators, courts, and all other participants in securities fraud litigation.  When such cases settle and the adversarial process melts away—the engagement and commitment of the parties to bring the matter to conclusion weakens.  Further, the application of inherently incompatible remedial principles—disgorgement, penalties, and restitution—should be analyzed carefully before a Court is burdened with tortured restructuring and embarrassing consequences.

BACKGROUND

I. The Proposed Consent Judgments

On April 28, 2003, the SEC filed civil actions to redress alleged violations of the

Securities Act of 1933 and rules of the National Association of Securities Dealers, Inc.

("NASD") and the New York Stock Exchange, Inc. ("NYSE") against ten separate investment

banks: Bear Stearns & Co. Inc. ("Bear Stearns"); Citigroup Global Markets Inc., f/k/a Salomon

Smith Barney Inc. ("Citigroup"); Credit Suisse First Boston LLC f/k/a Credit Suisse First Boston

Corporation ("Credit Suisse"); Goldman, Sachs & Co. ("Goldman Sachs"); J.P. Morgan

Securities Inc. ("J.P. Morgan"); Lehman Brothers Inc. ("Lehman Brothers"); Merrill Lynch

Pierce Fenner & Smith, Incorporated ("Merrill Lynch"); Morgan Stanley & Co. Incorporated

("Morgan Stanley"); UBS Warburg LLC ("UBS Warburg"); and U.S. Bancorp Piper Jaffray, Inc.

("U.S. Bancorp"). The SEC alleged that the investment banking groups at these institutions

exerted inappropriate influence over captive research analysts, compromising their objectivity

and spawning conflicts of interest. The SEC also filed civil actions against two former research

analysts: Jack Benjamin Grubman, formerly employed by Citigroup; and Henry McElvey

Blodget, formerly employed by Merrill Lynch. In February 2004, two additional investment

banks—Deutsche Bank Securities Inc. ("Deutsche Bank") and Thomas Weisel Partners LLC

("Thomas Weisel")—were added to the roster. These lawsuits grew out of a lengthy

investigation by federal and state securities regulators.

Concurrent with filing the complaints, the parties submitted proposed consent

judgments, inter alia, to disgorge ill-gotten gains, assess civil penalties, untangle investment

banking and research, and compensate aggrieved investors. The proposed judgments included:

(1) structural reforms in the relationship between investment banking and research; (2) $460

2

million for independent investment research; (3) $528.5 million in disgorgement and penalties to the states[1]; (4) $432.75 million in disgorgement and penalties as a federal payment; (5) $85 million for investor education programs[2]; and (6) the preservation of investors' rights to pursue any other remedy or recourse against the Defendants.[3]

The SEC offered no specificity regarding the federal payment of disgorgement and penalties to be used for restitution. The proposed consent judgments failed to offer a clear framework for formulating and implementing a distribution plan and left those matters to the Court, an unnamed administrator and independent consultants. The consent judgments simply stated that eligibility to participate in the proposed distribution funds was limited to investors who (i) purchased (ii) equity securities (iii) of a company referenced in the complaint (iv) through the investment bank defendant named in the complaint (v) during the relevant time period described in the complaint. Likely anticipating the specter of private securities litigation, the investment banks were also silent on the subject. This absence of particulars—such as identifying specific securities, specific violations, or cabining time periods for investor losses— belied the parties' public pronouncements about the extensive investigations and lengthy negotiations culminating in the proposed settlements. It also suggested that the litigants sought to quiet the public furor quickly and shift the formulation of a rationale for a critical element of the settlements—distribution—to the Court. The parties were equally vague about the contours of the $85 million investor education program. In short, the parties proposed to end the

---

[1] This sum includes Merrill Lynch's $100 million payment to New York State in late 2002 to settle then New York Attorney General Eliot Spitzer's claims of conflicted research.

[2] $30 million of this amount was earmarked for state investor educations programs.

[3] These sums include settlement payments by Deutsche Bank and Thomas Weisel in September 2004.

adversarial process the very day the lawsuits were filed and pass to the Court responsibility for freighting this substantial consignment.[4]

This Court declined the parties' invitation to embark on such an odyssey without any navigational aids. It should be reasonable to assume that sophisticated parties, like the SEC and Defendants investment banks, understand why they agree to make payments or accept them in satisfaction of a claim. A proposed judgment should include the essential terms of the settlement and provide sufficient detail to allow the Court to assure compliance. Hopefully, when funds from a settling defendant are to be distributed under Court supervision, the parties fully understand the relationship between the fund's corpus and the intended beneficiaries. However, this straightforward concept appeared to elude the parties in these settlements.

By Orders dated June 2 and July 3, 2003, this Court sought clarification of the proposed judgments' generalized and inchoate requirements. See SEC v. Bear Stearns & Co., 03 Civ. 2937 (WHP), 2003 WL 21517973 (S.D.N.Y. June 2, 2003); SEC v. Bear Stearns & Co., 03 Civ. 2937 (WHP), 2003 WL 21513187 (S.D.N.Y. July 3, 2003). Specifically, this Court prodded the parties to identify the relevant securities and time periods that would provide the essential parameters for disbursement of funds as to each investment bank. Such information would also help satisfy the requirement of Fed. R. Civ. P. 58 that a judgment be "a self-contained document." Massey Ferguson Division of Varity Corp. v. Gurley, 51 F.3d 102, 104 (7th Cir. 1995).

Even the seemingly pedestrian task of identifying relevant securities turned into a kabuki dance between the SEC and each of the investment banks. And some Defendants

---

[4] This is not to suggest that submitting a proposed consent judgment at the time an enforcement action is commenced is unusual. In fact, it happens with a fair degree of regularity. However, in these actions, the distribution plan was not tethered to any identified aggrieved investors. That made these proposed judgments unique and in many aspects unenforceable.

continue the dance marathon to the present. The SEC complaints alleged three claims: (1) violation of NASD and NYSE conduct rules due to conflicts of interest resulting from interactions between investment bankers and research analysts; (2) violation of NASD and NYSE rules by paying underwriting fees to other broker-dealers for research; and (3) violation of NASD and NYSE rules by failing to supervise. (See, e.g., Complaint against Morgan Stanley & Co., Inc.) The SEC provided a list of all the companies referenced in each complaint, but added that a number of companies may not have been mentioned by name. (See SEC Mem. in Response to the July 3, 2003 Order at 4-5.) The SEC also suggested, inter alia, that allegations in the complaints about the publication of misleading research should be part of the fund administrator's calculus.

Not surprisingly, the Defendant investment banks responded with different understandings about the reach of the consent judgments. Because the investment banks settled without admitting or denying the allegations, they argued there were no false or misleading statements in any research reports. J.P. Morgan's response was emblematic. After agreeing to pay $25 million in disgorgement and a $25 million penalty, it asserted that the SEC had not brought fraud or advertising charges against it and that no securities identified in the SEC's complaint were subject to charges that the bank published fraudulent research. (See Mem. of J.P. Morgan in Response to Question 1 of the Court's July 3, 2003 Order at 1-2.) In fact, now seeking to disclaim any responsibility, J.P. Morgan asserts that the equity securities and relevant time periods "were selected solely by the SEC." (See Comments and Proposal of J.P. Morgan Regarding the Distribution Fund Administrator's May 2009 Report at 2.)

The cacophony of diverse views suggested the SEC and the Defendants did not share an understanding regarding the basis for either the amounts of disgorgement and penalties

or the distribution of funds. For example, the SEC and U.S. Bancorp agreed to a $12.5 million

disgorgement and penalty to be used to compensate aggrieved investors. Yet when pressed to

identify the securities at issue, U.S. Bancorp named only two: one security in which there were

no transactions through U.S. Bancorp and another security involving only a $6,589 loss during

the relevant time period. Morgan Stanley took a different tact asserting that "the stocks . . . do

not readily lend themselves to ground rules for identifying which customers . . . should qualify

for distributions from the settlement fund." (Morgan Stanley's Supplemental Response to the

Court's July 3, 2003 Order at 1.) In sum, the destiny of the disgorgement and penalties seems to

have been an afterthought to the settlement of these cases.

       The exercise of identifying securities and time periods to serve as the basis for

distribution to aggrieved investors revealed a flaw with the proposed judgments. The remedial

principles animating the SEC's economic settlement in this case and in other enforcement

actions—disgorgement and civil penalties—were not compatible with a major objective the

parties sought to accomplish—restitution for aggrieved investors. Disgorgement "is intended to

deprive the violator of unjust enrichment, thereby furthering the deterrence objectives of the

securities laws." S.E.C. v. Drexel Burnham Lambert, 956 F. Supp. 503, 507 (S.D.N.Y. 1997)

(Pollack, J.); see also S.E.C. v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir. 1997) ("The primary

purpose of disgorgement orders is to deter violations of the securities laws by depriving violators

of their ill-gotten gains."). Although some courts and parties may equate disgorgement with

restitution, "they are distinct in that restitution aims to make the damaged persons whole, while

disgorgement aims to deprive the wrongdoers of ill-gotten gains." Drexel Burnham, 956 F.

Supp. at 507. The securities laws also authorize civil penalties to "serve as a deterrent against

securities laws violations." S.E.C. v. Cavanagh, 98 Civ. 1818 (DLC), 2004 WL 1594818, at *31

(S.D.N.Y. July 16, 2004). This is because to "limit the penalty for fraud to disgorgement is to tell a violator that he may commit fraud with virtual impunity; if he gets away undetected, he can keep the proceeds, but if caught, he simply has to be give back the profits of his wrong." S.E.C. v. Rabinovich & Assoc., 07 Civ. 10547 (GEL), 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008); see also Official Committee of Unsecured Creditors of WorldCom, Inc. v. S.E.C., 467 F.3d 73, 81 (2d Cir. 2006) (Congress passed the Securities Enforcement Remedies Act and Penny Stock Reform Act of 1990, which expanded the availability of penalties to most violations of securities laws, to further "the dual goals of punishment of the individual violator and deterrence of future violations."). In determining what penalty to impose, courts look to: (1) the egregiousness of the violations; (2) a defendant's scienter; (3) the repeated nature of the violations; (4) a defendant's failure to admit wrongdoing; (5) whether a defendant's conduct created substantial losses to others; (6) a defendant's lack of cooperation with authorities; and (7) whether the penalty should be reduced due to defendant's financial condition. See Rabinovich, 2008 WL 4937360, at *6; Cavanagh 2004 WL 1594818, at *31. Thus, in SEC enforcement cases, harm to investors has little, if any, role in arriving at a disgorgement amount and, at most, may be one of several factors considered in the civil penalty matrix.

Yet most SEC cases involving a substantial economic settlement include a provision providing for distributions to aggrieved investors. This is because "once the primary purpose of disgorgement has been served by depriving the wrongdoer of illegal profits, the equitable result is to return the money to the victims of the violation." Drexel Burnham, 956 F. Supp. at 507; see also Fischbach, 133 F.3d at 175 ("Although disgorged funds may often go to compensate securities fraud victims for their losses, such compensation is a distinctly secondary goal."). This is so even though the "measure of disgorgement need not be tied to the losses

suffered by defrauded investors." Fischbach, 133 F.3d at 176; see also S.E.C. v. Tome, 833 F.2d 1086, 1096 (2d Cir. 1987) ("Whether or not any investors may be entitled to money damages is immaterial [to disgorgement]."). In addition, in 2002, the Sarbanes-Oxley Act provided for the disbursement of civil penalties to investor victims to mitigate investor harm, without making investors losses a remedy available to the SEC. WorldCom, 467 F.3d at 82 ("Sarbanes-Oxley's Fair Fund provision provides the SEC with flexibility by permitting it to distribute civil penalties among defrauded investors by adding the civil penalties to the disgorgement fund.").

　　　　　While the SEC is guided by the principles of disgorgement and the value of civil penalties, defendants in such cases may consider the potential consequences of a protracted litigation, the risk of a litigation loss, the impact of adverse publicity, and the perils of related private and regulatory actions. Thus, the settlement of these actions, as with SEC enforcement proceedings, was motivated by several principles, none of which took into account the measure of investor damages. Usually, investor damages far exceed the settlement funds and distributions are made on a pro-rata basis, i.e., the amount of an investor's claim divided by the total amount of claims multiplied by available funds. But several of the funds here suffer the opposite problem—the available funds far exceed total claims, reflecting the disconnect between the SEC's remedial principles and its objective of restitution.

　　　　　Eventually, the SEC reached agreement with each of the Defendant investment banks on the relevant securities and time periods and presented amended consent judgments for the Court's consideration. On October 31, 2003, this Court entered Final Judgments in the actions. However, that was just the beginning.

II.  The Distribution Funds

On February 6, 2004, this Court appointed Professor Francis E. McGovern, Esq. as the Distribution Fund Administrator (the "Fund Administrator") to propose a distribution plan for the Distribution Funds consistent with the terms of the Final Judgments. On April 22, 2005, this Court approved the Global Research Analyst Settlement Distribution Plan (the "Distribution Plan").  See SEC v. Bear Stearns & Co., 03 Civ. 2937 (WHP), 2005 WL 937621, at *1 (S.D.N.Y. Apr. 22, 2005).

This Court directed Defendants to provide account and transaction data to allow the Fund Administrator to identify potential claimants, from which a Certification Form was created for each investor with a fully liquidated position and total stock purchases of less than $100,000. Claimants needed only to verify the data, review certain eligibility statements, and return the forms. The $100,000 was selected as a cutt-off for the purpose of requiring more than just a signature to verify the larger share purchases. Investors without fully liquidated positions received a similar Claim Form, which required them to document and provide transaction histories for un-liquidated shares. Another provision allowed investors who were not in Defendants' account and transaction data to request and submit claim forms. The Distribution Plan proceeded in two phases.

A.  Phase I Distribution

The first claim phase began in May 2005 ("Phase I"). The Fund Administrator employed traditional approaches to notice and claim filing. Notice was published in USA Today, New York Times, International Herald Tribune, Wall Street Journal, Parade, USA Weekend, Investor's Business Daily, and Barron's. The Certification and Claim Forms were mailed to investors between May 26, 2005 and June 4, 2005. Reminder letters were sent a few

9

weeks before the claim filing deadline to investors who had not returned a Certification or Claim Form. The reminder mailing was followed by reminder phone calls to those investors for whom a phone number could be located. A website and toll-free helpline were established and an internet link was posted on the SEC's website.

During Phase I, 41,260 Certification Forms and 32,058 Claim Forms were sent to investors. Of those, 21,127 Certification Forms were filed along with 11,365 Claim Forms—a total response rate of 44%. An additional 4,813 Claim Forms were received as a result of investor requests. The Fund Administrator determined that 19,856 claims, 53% of the claims filed, were valid and eligible for payment. A total of $284,919,173, 66% of the total available funds, was paid to investors in Phase I. The average payment was $14,349.

Because the Distribution Funds for Deutsche Bank and Goldman Sachs were exhausted during Phase I, investors through those banks received pro-rated payments of their claims. The following sums remained in the Distribution Funds after Phase I:

| Settling Party | Original Fund | Undistributed Funds (As of April 30, 2007)[5] | Percentage |
|---|---|---|---|
| Bear Stearns | $ 25      million | $ 24.9  million | 99.6 % |
| Citigroup | $157.5   million | $ 58.3  million | 37.0 % |
| Credit Suisse | $ 75      million | $ 13.2  million | 17.6 % |
| Deutsche Bank | $ 28.75 million | $  .7    million | 2.4 % |
| Goldman Sachs | $ 25      million | $  .4    million | 1.6 % |
| J.P. Morgan | $ 25      million | $ 24.6  million | 98.4 % |
| Lehman Brothers | $ 25      million | $ 18.3  million | 98.4 % |
| Merrill Lynch/Blodget | $   4     million | $  4.2  million | 73.2 % |
| Morgan Stanley | $ 25      million | $  6.8  million | 27.2 % |
| Thomas Weisel | $   5     million | $   .8   million | 16.0 % |
| UBS Warburg | $ 25      million | $  5.0  million | 20.0 % |
| U.S. Bancorp | $ 12.5  million | $  6.6  million | 52.8 % |
| **Total** | **$432.75 million** | **$163.8 million** | **37.8 %** |

---

[5] The amounts listed include interest accrued through April 30, 2007. The undistributed amounts for Deutsche Bank and Goldman Sachs represent uncashed checks and accrued interest.

B. Phase II Distribution

By order dated May 23, 2006, this Court directed the Fund Administrator to submit a proposal for the distribution of the remaining monies and allowed the parties to respond.

The Fund Administrator proposed additional outreach to locate eligible recipients who had not submitted a claim. In particular, he recommended seeking out individuals at large institutions responsible for processing claims.[6] (Transcript dated July 7, 2006 at 8.) Because the consent judgments required Defendants to pay all administrative costs of distribution, Defendants objected to the Phase II proposal and argued that the Fund Administrator would be unlikely to elicit any substantial additional response.

Many law schools have clinics that assist investors who suffered losses through improper advice and fraud. Representatives from some of these clinics appeared at the hearing and requested that a portion of the unexpended funds be set aside to fund their clinics. The SEC opposed these requests on the grounds that portions of the entire settlement were set aside for research ($450 million) and investor education ($85 million), while the purpose of the Distribution Funds was to return funds to aggrieved investors. (Transcript dated July 7, 2006 at 57.) After considering the varied recommendations of the Fund Administrator, the SEC,

---

[6] Despite the fact that financial institutions own almost half of all equity securities and dominate the trading of those securities, less than 30% of institutional investors with provable losses perfect their claims in securities class actions settlements. See James D. Cox & Randall S. Thomas, Letting Billions Slip Through Your Fingers: Empirical Evidence and Legal Implications of the Failure of Financial Institutions to Participate in Securities Class Action Settlements, 58 Stan. L. Rev. 411, 412, 415-16 (2005). While there are likely several explanations for the low participation rate, one of the reasons is undoubtedly the fact that notices and claim packets often are not forwarded to the individual who has responsibility for determining whether the institution has a claim and wishes to submit it. See Cox & Thomas, at 431-32.

Defendants, academia, and the investing public, this Court approved the Phase II proposal and authorized the Fund Administrator to extend his outreach for additional claims and victims.

Implementation of Phase II began in September 2006 with a pre-notice letter, followed by the mailing of Certification and Claim Forms in early October 2006. During Phase II, the Fund Administrator innovated to increase response rates by employing survey research field techniques and simplifying all mailings. He also utilized additional measures including multiple reminder letters and a re-mailing of the Certification and Claims Forms to investors who failed to respond. Multiple phone reminders were also initiated in November and December 2006.

Phase II outreach was tailored to an investor's individual characteristics, such as level of loss and whether the investor was an institution. Based on investor characteristics, the Fund Administrator created nine categories of investors and developed a specialized outreach protocol for each. Investors were identified as either individual or entity accounts based on account names and addresses. Mailings to custodians, investments managers, or institutional filers at the same address were bundled together and mailed as a packet. Internet and directory research was utilized to identify contact people at large institutional investors to be targeted for follow-up and reminder phone calls.

In Phase II, 9,082 Certification Forms and 16,291 Claim forms were mailed. Phase II's targeted outreach led to the filing of 5,385 Certification Forms and 6,648 Claim Forms—a 47% response rate. This response rate was remarkable for two reasons: first, it represents submissions from people who failed to respond in Phase I, and second, the response rate exceeded the rate for Phase I. This underscores the importance of making a second effort to solicit unresponsive claimants in any class action litigation. After review, the Fund

Administrator determined that 10,299 of these claims—86%—were valid and eligible for payment. An additional $92,956,548 (21% of the original Distribution Funds) was paid to investors, with an average payment of $9,026.

The funds of four more Defendants—Credit Suisse, Morgan Stanley, Thomas Weisel, and UBS Warburg—were exhausted during Phase II. Investors who purchased identified securities through those Defendants also received pro-rated payment of their claims.

C. Summary of the Fund Administrator's Efforts

The two discrete efforts to distribute funds resulted in the mailing of 108,243 Certification and Claim forms and the filing of 44,525 claims. Two thirds of all claims filed (30,155) were paid, resulting in the distribution of $377,875,720. The average payment was $12,531.

For those Distribution Funds where payments were pro-rated, a guiding rule was to take into account the comparative impact of the alleged conduct on claims involving the same security. Accordingly, two principles—the proximity principle and the information principle—were applied to refine pro-rated distributions.[7] The proximity principle reflects the fact that a relevant event is likely to have a decreasing impact on a transaction over time. Therefore, those aggrieved investors who purchased the equity security closer to the beginning of the time period received a higher compensation rate than those who purchased later. The information principle was based on the premise that purchasers of smaller amounts of equity securities are more likely to spend less on information such as analyst research and therefore were more likely to have been affected by the conduct alleged in these actions. To apply this principle, the Fund

---

[7] Where there were sufficient amounts in a Distribution Fund to pay all claims, there was no reason to parse investor claims.

Administrator employed an adjustment factor to investors whose total purchases from a Defendant were larger than the median value for all investors, reducing their recovery.

These two principles resulted in a large share of the Distribution Funds going to those investors with smaller purchases—the investors more likely to have been affected by the investment bank Defendants' conduct. Three-fourths of the payments went to investors with losses of $3,242 or less and who had purchased 1,000 or fewer shares. The remaining payments went to investors with greater losses, the largest being $13,851,008 to a sovereign wealth fund which purchased 2,025,000 shares.

The Fund Administrator's efforts cost approximately $9.3 million during Phase I. Those costs were reimbursed by the Defendant investment banks in proportion to the relative sizes of their Distribution Funds and did not diminish the monies available to pay aggrieved investors. Several Defendant investment banks balked at paying for outreach efforts after Phase I was completed. The SEC acquiesced to the Fund Administrator's recommendation that the Court relieve the investment banks of their obligation to pay administrative costs for Phase II.[8] Approximately $3.8 million was expended in Phase II.

III. The Residual Distribution Funds

Despite the Fund Administrator's prodigious efforts, several Distribution Funds remained virtually untouched even after Phase II. How did the SEC's "Global Research Analyst Settlement" restitution program reach such an impasse? While the SEC professed its interest in restitution, it did not focus its considerable analytical resources on the identification of relevant securities, time frames and potential claims before presenting the distribution plans to this Court.

---

[8] The investment banks voicing the most strenuous objections to underwriting Phase II were the same institutions that agreed to distribution plans that were impossible to implement.

It appears the regulators deferred to the regulated. The investment banks and the SEC each had trade data permitting them to analyze the number of shares purchased or sold for any security through any given investment bank and the relevant market prices for any time period. Thus, all of the parties were capable of estimating investor losses with reasonable precision. Whether intentional or inadvertent, some Defendants were able to minimize investor losses and liability in private securities fraud litigation. As the guardian of the markets, the SEC could have drawn parameters that reflected the agency's view of the scope of the fraud. But apparently it did not. In failing to perform its due diligence, the SEC missed the opportunity, if not the obligation, to anticipate those Funds likely to be substantially devoid of claims.

Thus, the Distribution Funds negotiated by Bear Stearns, J.P. Morgan, and Merrill Lynch/Blodget were doomed from the outset because there was a complete disconnect between the amount of disgorgement and civil penalties on the one hand and investor losses on the other. This anomaly should have been known or determined by the parties and disclosed to the Court at the outset. It only emerged after data were transferred to the Fund Administrator for analysis— data to which the parties had ready access well before initiating the cases at bar. The Fund Administrator's efforts yielded virtually no benefit in these cases because there were no investor losses to be recompensed. At the very least, the SEC should have recognized and collaborated with these Defendants to resolve the problem before they offered the amended consent judgments to the Court. Of course, the April 2003 headlines regarding the "Global Research Analyst Settlement" had faded by September, and the SEC as well as these Defendants were indifferent to the mechanics of restitution. The SEC is generally recognized as expert at identifying aggrieved investors in securities fraud litigation. Thus, it is surprising that it failed to

discern the cases which lacked investor harm and woodenly persisted in seeking a solution (investor restitution) without a problem (investor losses).

This Court believed the SEC had brought its expertise to bear on the issue at the time the settlements were submitted for approval in October 2003. But three years elapsed before the SEC acknowledged that the amounts the Defendants paid, representing both disgorgement and penalties, were not necessarily connected to any measure of investor losses. (Transcript dated July 17, 2006 at 55-56.) Had the SEC realized that earlier, several exercises in futility could have been obviated and the current predicament—$79 million accumulating interest at the Federal Reserve Bank of New York with no payees—avoided.[9]

Oversight of the decrees has required significant time and presented unique challenges. Even when litigants are thoroughly engaged in carrying out the terms of a decree, the creation and administration of distribution funds and other remedial programs pose steep challenges. But a common class action phenomenon—the loss of interest by the parties in the litigation after reaching a settlement—can make that task nearly impossible and lead to ever-larger residual funds that cannot be distributed.

In many ways, this distribution process has been similar to that in class actions. In every class action settlement, a small percentage of class members never cash their checks.

---

[9] The funds were deposited, at the Court's suggestion and with the approval of the Administrative Office of the United States Courts, into accounts at the Federal Reserve Bank of New York pursuant to § 15 of the Federal Reserve Act. As originally proposed, the consent judgments required the investment banks to deposit their settlement payments into the Court Registry Investment System (CRIS). See 28 U.S.C. §§ 1914, 2041, 2045. However, another provision of the proposed judgments prohibited the investment banks from deriving any direct or indirect benefit from the funds. Ironically, at the time, an affiliate of J.P. Morgan earned fees by managing CRIS accounts for the United States courts. Thus, had the funds been deposited as the parties proposed, a central tenet of the judgments would have been violated. See SEC v. Bear Stearns & Co., 03 Civ. 2937 (WHP), 2003 WL 21517973 (S.D.N.Y. June 2, 2003).

That is a transactional certainty. On occasion, monies remain even after all identifiable victims have been paid. In those situations, the equitable doctrine of cy pres is invoked to bring finality to the litigation. Sometimes, the stakes can be high. However, the question of what to do with $79 million in unclaimed funds is unprecedented. It has stimulated a cy pres feeding-frenzy of competing interests.

IV. Proposals of Interested Parties

As of April 30, 2009, $79,261,488[10] remains undistributed and allocated as follows:

| Settling Party | Original Fund | | Residual as of April 30, 2009 | Percentage |
|---|---|---|---|---|
| Bear Stearns | $ 25 | million | $25.3 million | 101.2 % |
| Citigroup Global Markets | $157.5 | million | $ 8.3 million | 5.3 % |
| Credit Suisse First Boston | $ 75 | million | $ 1.0 million | 1.3 % |
| Deutsche Bank | $ 28.75 | million | $ 0.8 million | 2.9 % |
| Goldman Sachs | $ 25 | million | $ 0.9 million | 3.6 % |
| J.P. Morgan | $ 25 | million | $24.2 million | 96.8 % |
| Lehman Brothers | $ 25 | million | $ 9.7 million | 38.8 % |
| Merrill Lynch/Blodget | $ 4 | million | $ 4.2 million | 105 % |
| Morgan Stanley | $ 25 | million | $ .3 million | 1.2 % |
| Thomas Weisel Partners | $ 5 | million | $ .1 million | 2.0 % |
| UBS Warburg/Paine Webber | $ 25 | million | $ .2 million | 0.8 % |
| U.S. Bancorp Piper Jaffray | $ 12.5 | million | $ 4.1 million | 33.1 % |
| **Total** | **$432.75 million** | | **$ 79.3 million** | **18.3 %** |

This Court invited suggestions for distribution of the remaining funds from the Fund Administrator, the parties, and the public. On May 27, 2009, the Fund Administrator offered three additional proposals for payments to aggrieved investors, but conceded that those distributions would not exhaust the residual funds. First, there are 3,842 eligible claimants who

---

[10] This amount includes approximately $700,000 in court and administration fees that have not been disbursed yet.

received no payment because their calculated losses fell below the minimum payment of $100. Second, pre-judgment and post-judgment interest could be paid to all claimants. Finally, a pro-rata distribution of any funds remaining as a result of uncashed checks and left-over reserves could be made to claimants in the Goldman Sachs, Deutsche Bank, Credit Suisse, Morgan Stanley, Thomas Weisel, and UBS Warburg Distribution Funds.

The SEC concurs with the Fund Administrator's proposals. Three of the six Defendants with residual funds—Citigroup, Lehman Brothers, and U.S. Bancorp—object to the payment of pre-judgment or post-judgment interest on the grounds that investors have already been compensated for 100% of their losses without regard to general market declines or industry-wide adverse effects. They argue that any additional payments would be a windfall to investors. Their objection to interest payments is an insult to reason and the banking system's business model. It is ironic that Citigroup, a financial institution that operates one of the largest consumer credit card networks in the world, would advance the startling proposition that investors are not entitled to interest on the money owed to them. (See Citigroup's Letter dated June 4, 2009 in Response to the Fund Administrator's May 27, 2009 Report.)

Five of the Defendants—Citigroup, Lehman Brothers, U.S. Bancorp, Bear Stearns, and J.P. Morgan—proposed that the monies be used to settle existing litigations in other courts and arbitrations involving allegations similar to those at issue in these actions. (See Proposal of Citigroup for use of Residual Funds for Other Litigation and/or Arbitrations dated Sept. 24, 2007; Lehman Brothers' Submission Regarding the Proposed Second Residual Plan dated Sept. 24, 2007; U.S. Bancorp Submission Regarding Distribution of Unexpended Funds dated Sept. 24, 2007; Bear Stearns' Proposal for Use of Research Analyst Settlement Remaining Funds dated Sept. 24, 2007; Proposal of J.P. Morgan Regarding Distribution of Unexpended

Funds dated Sept. 24, 2007.) While Merrill Lynch/Blodget supported such a concept, it had no ongoing related litigation or arbitrations and, therefore, proposed that its Distribution Fund be transferred to the United States Department of Treasury. (See Merrill Lynch Response Regarding Distribution of Remaining Funds dated Sept. 24, 2007.) In their comments on the Fund Administrator's May 2009 Report, a number of investment banks urged this Court to allow undistributed funds to be applied to their obligations in a settlement reached in In re IPO Securities Litigation, which is pending in this district. (See Bear Stearn's Response to the Fund Administrator's May 27, 2009 Report dated June 4, 2009; Citigroup's Letter dated June 4, 2009 in Response to the Fund Administrator's May 27, 2009 Report; J.P. Morgan's Comments and Proposals Regarding the Fund Administrators May 27, 2009 Report dated June 4, 2009; U.S. Bancorp's Letter dated June 4, 2009 in Response to the Fund Administrator's May 27, 2009 Report.) The SEC opposed any use of the remaining monies to settle claims in other litigations or arbitrations because those proposals would confer benefits on the Defendants and therefore, conflict with the Final Judgments and the underlying principles of disgorgement and civil penalties.

The SEC proposed that any remaining funds should be distributed in equal shares to the SEC, for remittance to the Treasury, the NYSE, and NASD. Certain law schools once again requested that the Court set aside a certain portion of the unexpended funds for investor protection clinics.[11]

---

[11] While not directed specifically at this matter, the Court also regularly receives mailings from various organizations soliciting the donation of any monies remaining in a class action settlement fund.

DISCUSSION

A district court has "broad discretionary powers" with regard to "equitable decrees involving the distribution of any unclaimed class action fund." Van Gemert v. Boeing Co., 739 F.2d 730, 737 (2d Cir. 1984).

The concept of cy pres, also known as "fluid recovery", originated in the context of charitable trusts. Where a testator's intent could not be carried out, a court could modify the trust in a manner that would best carry out the testator's intent, i.e., the "next best" use. The concept has been extended, by some courts, to situations where funds remain undisbursed after a class action settlement. The purpose of the cy pres distribution is to "put the unclaimed fund to its next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class." Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2006) (quoting 2 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 10:17 (4th ed. 2002)). "Federal courts have frequently approved [the cy pres] remedy in the settlement of class actions where the proof of individual claims would be burdensome or distribution of damages costly." Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1305 (9th Cir. 1990).

The use of a cy pres remedy to distribute remaining funds in a class action settlement poses many dangers. First, in practice, cy pres remedies often stray far from the "next best use" for the undistributed funds and turn courts into a grant giving institution doling out funds to hospitals, legal services organizations, law schools, and other charities. See, e.g., In re Infant Formula Multidistrict Litig., No. 91 Civ. 878 (MP), 2005 WL 2211312 (N.D. Fla. Sept. 8, 2005) (distributing $700,000 in undistributed funds in a price fixing class action involving infant formula to the American Red Cross Hurricane Katrina Disaster Relief Fund for distribution of infant formula); In re Motorsports Merchandise Antitrust Litig., 160 F. Supp. 2d 1392, 1396-99

20

(N.D. Ga. 2001) (distributing $1.85 million remaining from a settlement of a price fixing class action relating to merchandise sold at professional stock car races to ten organizations including the Duke Children's Hospital and Health Center, the Make-a-Wish Foundation, the American Red Cross, and the Susan G. Komen Breast Cancer Foundation); Superior Beverage Co., Inc. v. Owens-Illinois, Inc., 827 F. Supp. 477, 480 (N.D. Ill. 1993) (in an antitrust class action, inviting applications for and awarding "grants" totaling over $2 million to fifteen applicants including the San Jose Museum of Art, the American Jewish Congress, a public television station, and the Roger Baldwin Foundation of the American Civil Liberties Union of Illinois); Six Mexican Workers, 904 F.2d 1301 (rejecting district court's proposal to distribute unclaimed statutory damages in a Fair Labor Standards Act class action on behalf of Mexican farm workers to the Inter-American Fund for distribution to Mexico); In re Corrugated Container Antitrust Litig., MDL 310, 53 Antitrust & Trade Regulation Reports 711 (S.D. Tex. Oct. 6, 1987) (distributing more than $1 million to, among others, eight law schools.); Fears v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911 (HB), 2007 WL 1944343, at *10-11 (S.D.N.Y. July 5, 2007) (distributing over $6 million remaining from the settlement of a Sherman Act class action on behalf of models to various projects at New York hospitals and medical centers that target women). In fact, in some cases courts even go so far as to review the effectiveness of these "grants." See, e.g., Fears, 2007 WL 1944343, at *10-11 (requiring annual reports from grantees). Distributing grants and reviewing the effectiveness of their use is not an appropriate use of judicial resources and transforms courts into eleemosynary institutions.

      In fact, cy pres distributions often stray even further from the "next best use" to a use that actually benefits the defendant rather than the plaintiffs. In general, defendants reap goodwill from the donation of monies to a good cause. However, defendants may also channel

money into causes and organizations in which they already have an interest. See, e.g., Schwartz v. Dallas Cowboys Football Club Ltd., 362 F. Supp. 2d 574, 577 (E.D. Pa. 2005) (in an antitrust class action relating to the satellite television bundling of National Football League games, the court distributed approximately $400,000 to the NFL's Youth Education Town Centers, which was funded in part by the defendant); Park v. Thomson, 05 Civ. 2931 (WHP), 2008 WL 4684232, at *2 (S.D.N.Y. Oct. 22, 2008) (initially proposing a settlement plan to distribute to victims $3 million of $13 million settlement, with the remainder to be used by the Defendants, who provide bar preparation courses and materials to lawyers, to establish a cy pres fund for lawyers entering public service).

Although not relevant in this case, cy pres distributions often benefit plaintiffs' attorneys. To the extent attorney's fee awards are determined using the percentage of recovery method, the recovery and, therefore, the attorney's fee award is exaggerated by cy pres distributions that do not truly benefit the plaintiff class. In addition, many cy pres distributions are channeled to organizations that support the work done by plaintiffs' attorneys, thus, indirectly benefiting the plaintiffs' attorneys. See, e.g., Diamond Chem. Co. v. Akzo Nobel Chems. B.V., 01 Civ. 2118, 02 Civ. 1018 (CKK), (D.D.C. July 10, 2007) (awarding cy pres distribution in an antitrust action to establish a competition center at a law school).

Finally, and most importantly, while courts and the parties may act with the best intentions, the specter of judges and outside entities dealing in the distribution and solicitation of large sums of money creates an appearance of impropriety. In an editorial, the Washington Post noted that while "Federal judges are permitted to find other uses for excess funds, [ ] giving the money away to favorite charities with little or no relation to the underlying litigation is inappropriate and borders on distasteful. In all but the rarest of circumstances, those funds

22

should be made available to individual plaintiffs and not to outside organizations—no mater how

worthy." Editorial, *When Judges Get Generous*, WASH. POST, Dec. 17, 2007, at A20. Similarly,

after noting several examples of cy pres distributions in class actions settlements, a New York

Times article noted that "[l]awyers and judges have grown used to controlling these pots of

money, and they enjoy distributing them to favored charities, alma maters and the like." Adam

Liptak, *Doling out Other People's Money*, N.Y. TIMES, Nov. 26, 2007; see also George Krueger

& Judd Serotta, Op-Ed, *Our Class-Action System is Unconstitutional*, The Wall Street Journal,

Aug. 6, 2008 ("Judges, in their unlimited discretion, have occasionally been known to order a

distribution to some place like their own alma mater or a public interest organization that they

happen to favor.").

       Bar associations support the use of cy pres distributions to fund legal aid and legal

services programs that provide representation to indigent clients. See, e.g., New York State Bar

Association Manual on Cy pres For Legal Services, *available* at

http://www.nysba.org/Content/ContentFolders4/CommercialandFederalLitigationSection/ComFe

dReports/CyPresReport.pdf. The funding of legal services programs is a worthy pursuit.

However, absent specific legislation, courts are left with unfettered discretion to direct the

distribution of what can be large sums of money. Cf. Wash. Ct. R. 23(f)(2) (requiring

distribution of 25% of any residual funds from a class action settlement to the Legal Foundation

of Washington); N.C. Gen. Stat. § 1-267.10 (requiring distribution of any residual funds from a

class action settlement to the Indigent Person's Attorney Fund and to the North Carolina State

Bar for the provision of civil legal services for indigent persons). In this case, $79 million

dollars in undistributed settlement funds remain—an enormous sum, requiring a Court to

proceed with caution.

The Court of Appeals has indicated that the draft Principles of the Law of Aggregate Litigation by the American Law Institute (the "ALI Draft") is an appropriate standard for courts to consider in distributing class actions settlements. See Wilhelmina, 473 F.3d at 436. The ALI Draft sets forth proposed rules for the use of a cy pres distribution in class action settlements, which attempt to rein in the use of cy pres distribution to only the most appropriate situations. The proposed rules are premised on the fact that "funds generated through the aggregate prosecution of divisible claims are presumptively the property of the class members." Council Draft No. 2 of the Principles of the Law of Aggregate Litigation, The American Law Institute, § 3.07 at 232.  The ALI Draft states:

> [i]f the settlement involves individual distributions to class members and funds remain after distributions (because some class members could not be identified or chose not to participate), the settlement should presumptively provide for further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair.

ALI Draft, § 3.07 at 231.  The ALI Draft goes on to caution that if "the court finds that individual distributions are not viable . . . , the settlement may utilize a cy pres approach only if the parties can identify a recipient involving the same subject matter as the lawsuit that reasonably approximates the interests being pursued by the class." ALI Draft, § 3.07 at 231. The ALI Draft assumes that a cy pres distribution is preferable to returning any remaining funds to a defendant because that option would "undermine the deterrence function of class actions and the underlying substantive-law basis of the recovery by rewarding the alleged wrongdoer simply because distribution to the class would not be viable." ALI Draft, § 3.07 at 233.  While the ALI Draft also takes the position that a cy pres distribution is preferable to escheat to the state, which benefits all citizens equally, the Ninth Circuit has recognized that escheat to the government serves the "deterrence and enforcement goals" of federal statutes. Six  Mexican Workers, 904

24

F.2d 1308; see also Fischbach, 133 F.3d at 175 ("The primary purpose of disgorgement orders is to deter violations of the securities laws.").

Consistent with the premise articulated by the American Law Institute, this Court and the Fund Administrator exhausted every possible avenue to distribute funds to aggrieved investors. While the first distribution phase resulted in a significant response rate—44%—and the Fund Administrator distributed $284,919,173, representing 66% of the Distribution Fund, this Court determined that more could be done. As a result, a second distribution phase employed targeted outreach aimed at increasing the number of investors filing claims. This additional effort yielded 10,299 additional claims, leading to the distribution of another $92,956,548 to aggrieved investors. In everyone's estimation, the law of diminishing returns suggests the game is no longer worth the candle.

Because they can be accomplished with a modest effort, this Court adopts the trident of proposals by the Fund Administrator. Each of them advances the salutary purpose of the Distribution Funds—compensation of victims. Interest shall be calculated from the date of the loss to the date of payment, using the statutory interest rate fixed for each year and compounded annually. See 28 U.S.C. § 1961. The minimum interest payments shall be $10 and the calculation of interest payments falling below the minimum threshold shall be rounded up to the minimum payment. For any Distribution Fund requiring pro-rated interest payments, any interest payment falling below the threshold of $10 shall not be rounded up. The Fund Administrator estimates that all of these payments will result in additional distributions to victims of approximately $13.8 million. That still leaves $65 million.

The investment banks argue that the next best use of the remaining monies would be to fund settlements involving allegations of conflicted research. However, that would fly in

the face of the express language of the Final Judgments they signed, not to mention the

principles underlying disgorgement and civil penalties in SEC cases. Each Final Judgment states

that "Defendant relinquishes all legal and equitable right, title, and interest in [the funds paid by

Defendant], and no part of the funds shall be returned to Defendant" and that "the Distribution

Fund shall not be used directly or indirectly to pay Defendant." (Final Judgments §§ II.B,

III.C.1.) If the undistributed funds were used to settle related litigations and arbitrations, some

investors would receive compensation for injuries similar to those that were to be compensated

by the Distribution Funds. However, Defendants would benefit from not having to pay those

settlements with their own money. This would violate the terms of the Final Judgments by, in

effect, returning funds to the Defendants for use to settle other matters. Accordingly, this Court

rejects the proposal by the Defendant investment banks and declines to authorize the use of the

remaining monies for settlement of other litigations or arbitrations.

This Court also rejects the SEC's proposal that the unclaimed funds be distributed

among the U.S. Treasury and "the other regulators responsible for bringing this action." (See

Transcript dated Sept. 12, 2007 at 10-11; see also SEC Letter dated June 3, 2009 in Response to

the Fund Administrator's May 27, 2009 Report.) The SEC argues that the NASD and the NYSE

agreed to have their portions of the settlement incorporated in the SEC's action and that "if there

is a reversion of funds, [the SEC] would suggest that it go a third to each of the regulators

responsible." (Transcript dated Sept. 12, 2007 at 11.) While each Final Judgment states that the

Defendant makes the payment "in connection with the resolution of [the] action and related

proceedings instituted by NASD and NYSE," the actions at bar were filed by the SEC alone.

(Final Judgments § IIB.) This Court declines to redirect residual funds to third-party regulators,

regardless of any understanding they may have had with the SEC, absent an explicit provision in

the Final Judgments. No agreements were ever presented to the Court. Moreover, to the exent

the NASD and the NYSE had initiated proceedings against the Defendants involving allegations

parallel to those in these actions, both regulators may share some responsibility with the SEC and

the Defendants for the failure to identify relevant securities and time periods to ensure that the

Distribution Funds would be exhausted.

There are additional reasons why this Court would not authorize any payment to

the NASD, now known as FINRA, or the NYSE. First, the Final Judgments allotted $55 million

for an investor education foundation to fund worthy and cost-efficient programs designed to

provide investors with the knowledge and skills necessary to make informed investment

decisions. The SEC proposed an investor education plan and nominated a board to carry out its

objectives. While the plan to create a new grant making investor education entity was

worthwhile, the SEC abandoned it because of "organizational issues and difficulties that could

not be overcome." (Transcript dated June 9, 2005 at 6.) Here again, the SEC did not anticipate

the scope of the undertaking. Instead, bureaucratic inertia led to the SEC's proposal to dissolve

the foundation and transfer the funds to the NASD Foundation, an existing grant-making investor

education entity. In June 2005, the SEC argued that resort to the NASD Foundation would be

"efficient . . . cost-effective . . . [and would] result in the expeditious distribution of investor

education funds." (Transcript dated June 9, 2005 at 6.) The SEC also asserted that it had a good

working relationship with the NASD Foundation and would have "a continuing oversight role."

(Transcript dated June 9, 2005 at 7.)

By order dated September 2, 2005, this Court granted the SEC's application,

directed the investor education foundation to wind down its affairs and ordered the transfer of

investor education funds to the NASD Foundation, now known as the FINRA Foundation. To

put it mildly, the FINRA Foundation's performance has been disappointing. For the three years

ending September 30, 2008, the FINRA Foundation disbursed only $6.5 million to grantees,

while paying $800,000 in general and administrative expenses. The September 2, 2005 Order

specifically provided that the "[FINRA] investor education account will not be used as a

permanent endowment . . . and that the [FINRA] Foundation will use its best efforts to distribute

these funds . . . by no later than ten years from the date of [the] Order." After three and a half

years, it is not unreasonable for this Court to urge the FINRA Foundation to fulfill its

commitment. The SEC's latest quarterly filing for the FINRA Foundation reveals cumulative

dividend income of $4.2 million. Thus, only $2.3 million of the $55 million corpus has been

disbursed. At this rate, it will take the FINRA Foundation decades to disburse the money.

Moreover, while the SEC is required to file FINRA Foundation oversight reports

quarterly, its latest filing on February 4, 2009 was for the quarter ending September 30, 2008.

That the report is filed five months after the end of the quarter and has so little to report suggests

that the investor education initiative has also been relegated to backwaters at the SEC and at the

FINRA Foundation. Even a cursory review suggests that grant-making by the FINRA

Foundation has not resulted in an "expeditious distribution of investor education funds." By this

Court's calculation, the FINRA Foundation's administrative costs are more than $21,800 per

grant approved and the average grant is approximately $200,000. Amazingly, FINRA reported

that "no additional funding requests were brought to the board during the quarter ended

September 30, 2008." Is this the efficient and cost-effective program the SEC had in mind when

it urged this Court to adopt it? When will the SEC exercise its responsibility to ensure that these

substantial sums are expended to educate the investing public? With this history, it is not

surprising that the SEC has not proposed transferring the balance of the distribution to the FINRA Foundation.

As for the NYSE, this Court takes judicial notice of the fact that it is no longer the institution that existed at the time these actions were filed. The NYSE is a publicly-held for-profit corporation. While it may have been involved in negotiations with the investment banks that led to the settlements, it never showed any interest in this litigation. Any distribution to the NYSE would be a windfall and encourage agreements dehors this Court.

The law school clinics provide an invaluable service to aggrieved investors and offer an attractive alternative, but this Court is confined by the consent judgments in these actions. All of the parties object to any payment to investor protection clinics. The history of this case suggests that those clinics might have been better shepherds of an investor education program than the SEC or the FINRA Foundation. One of the clinics advises the Court that its grant request was denied by the FINRA Foundation because the Foundation is apparently barred from "funding ongoing clinical activities." (See The Bluhm Legal Clinic at Northwestern University School of Law Letter dated June 4, 2009.) The FINRA Foundation appears to be having difficulty identifying investor education programs deserving support. If such a restriction exists, perhaps the SEC can prevail on the FINRA Foundation to amend its guidelines to fund grants to qualified law school clinics. Moreover, this Court invites the SEC and the FINRA Foundation to collaborate on proposals with realistic time lines to administer investor education projects so that the funds in these cases will be disbursed by the 10th anniversary of the September 2, 2005 Order.

The original sources of the Distribution Funds were disgorgement and penalties. Those monies are the property of the Government. In this case, those origins also answer the

question of how the money can be used to do "the greatest good for the greatest number of people." Relying on Jeremy Bentham's principle of utility, the obvious answer is transfer the remaining money to the United States Department of Treasury to be used by the Government for its operations. Pragmatism, simplicity and the need for finality also counsel this denouement. Accordingly, in the exercise of its informed discretion, this Court authorizes and directs the transfer of funds from the Federal Reserve Bank of New York and other depository institutions to the United States Department of Treasury. See 28 U.S.C. §§ 2041, 2042 (a district court has the authority to transfer funds to Treasury that have been paid into a United States court and that remain unclaimed for five years); see also Drexel Burnham, 956 F. Supp. 503 (directing the transfer of disgorgement funds to the United States Department of Treasury).

In the final analysis, this Court does not question the SEC's interest in bringing to an end improper conduct. Nor does it question the SEC's interest in recompensing investor victims and deterring future violations. However, whether the SEC has the institutional resolve and commits adequate resources to reach these goals is an open question

CONCLUSION

Accordingly, this Court directs that any monies remaining in the Distribution Funds after the additional remedial payments and allowance for costs and fees discussed in this Memorandum and Order be transferred to the United States Department of Treasury. The SEC is directed to submit a proposed implementing order allowing for administrative expenses and fees for the Administrative Office of the United States Courts.

The Clerk is directed to file copies of this Memorandum and Order in all of the related actions: (1) SEC v. Bear Stearns and Co. Inc., 03 Civ. 2937 (WHP); (2) SEC v. Jack B. Grubman, 03 Civ. 2938 (WHP); (3) SEC v. J.P. Morgan Securities Inc., 03 Civ. 2939 (WHP); (4) SEC v. Lehman Brothers Inc., 03 Civ. 2940 (WHP); (5) SEC v. Merrill Lynch Pierce Fenner & Smith, Inc., 03 Civ. 2941 (WHP); (6) SEC v. U.S. Bancorp Piper Jaffray, Inc., 03 Civ. 2942 (WHP); (7) SEC v. UBS Securities LLC, 03 Civ. 2943 (WHP); (8) SEC v. Goldman, Sachs and Co., 03 Civ. 2944 (WHP); (9) SEC v. Citigroup Global Markets Inc., 03 Civ. 2945 (WHP); (10) SEC v. Credit Suisse First Boston LLC, 03 Civ. 2946 (WHP); (11) SEC v. Henry M. Blodget, 03 Civ. 2947 (WHP); (12) SEC v. Morgan Stanley & Co. Incorporated, 03 Civ. 2948 (WHP); (13) Deutsche Bank Securities Inc., 04 Civ. 06909 (WHP); and (14) Thomas Weisel Partners LLC, 04 Civ. 06910 (WHP).

Dated:  June 10, 2009
        New York, New York


SO ORDERED:


WILLIAM H. PAULEY III
U.S.D.J.

All Counsel of Record