**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BEAR, STEARNS & CO. INC.,<br><br>Defendant | 03 Civ. 2937 |
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>J.P. MORGAN SECURITIES INC.,<br><br>Defendant | 03 Civ. 2939 |
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>LEHMAN BROTHERS INC.,<br><br>Defendant | 03 Civ. 2940 |
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,<br><br>Defendant | 03 Civ. 2941 |

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>UBS SECURITIES LLC, f/k/a UBS WARBURG LLC,<br><br>Defendant | 03 Civ. 2943 |
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GOLDMAN, SACHS & CO.,<br><br>Defendant | 03 Civ. 2944 |
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CITIGROUP GLOBAL MARKETS INC., f/k/a SALOMON SMITH BARNEY,<br><br>Defendant | 03 Civ. 2945 |
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT SUISSE FIRST BOSTON LLC, f/k/a CREDIT SUISSE FIRST BOSTON CORPORATION,<br><br>Defendant | 03 Civ. 2946 |

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff,<br>v.<br>MORGAN STANLEY& CO. INCORPORATED,<br>Defendant | 03 Civ. 2948 |
| SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff,<br>v.<br>DEUTSCHE BANK SECURITIES INC.,<br>Defendant | 04 Civ. 6909 |

**MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED RULE 60(b) MOTION TO MODIFY GLOBAL RESEARCH SETTLEMENT AND ENTER AMENDED FINAL JUDGMENT**

Dated: December 5, 2025

WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20037

*Attorneys for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................3

I. The Settlement Resolved Conflict-of-Interest Allegations from a Period Before There Were Comprehensive Industry-Wide Rules Addressing the Conduct at Issue. ....................................................................................................3

A. Substantive Terms of the Settlement ....................................................................................................5

B. Procedure for Modifying the Settlement....................................................................................................6

II. Judge Pauley Previously Approved Modifications to the Settlement, Consistent with the Intent of the Parties and the Plain Language of the Settlement. ............................9

III. FINRA Has Issued a Comprehensive Rule Governing Research Analyst Conflicts of Interest, Which Has Effectively Supplanted the Remaining Provisions of Addendum A in the Settlement. ....................................................................................................13

LEGAL STANDARD....................................................................................................18

ARGUMENT ....................................................................................................19

I. Consistent with the Plain Language of the Settlement, and in Light of the Significant Changes to the SRO Rules, the Court Should Modify Addendum A by Terminating the Remaining Terms in Sections I and II....................................................19

II. Maintaining a Fractured Regulatory Scheme Would Not Be in the Public Interest Because It Would Impose Unnecessary Burdens and Costs Without Any Corresponding Public Benefit. ....................................................................................................22

CONCLUSION....................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Horne v. Flores*,
557 U.S. 433 (2009)....................18, 20

*Kemp v. United States*,
596 U.S. 528 (2022)....................19

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. Wis.*,
769 F.3d 543 (7th Cir. 2014)....................18, 19

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988)....................19

*Patterson v. Newspaper & Mail Deliverers' Union*,
13 F.3d 33 (2d Cir. 1993)....................18, 22

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992)....................24

*SEC v. Bear, Stearns & Co. Inc.*,
2003 WL 22466156 (S.D.N.Y. Oct. 31, 2003)....................5

*Still's Pharmacy, Inc. v. Cuomo*,
981 F.2d 632 (2d Cir. 1992)....................18, 20

*Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*,
864 F.3d 172 (2d Cir. 2017)....................18

*United States v. Paramount Pictures, Inc.*,
2020 WL 4573069 (S.D.N.Y. Aug. 7, 2020)....................19, 20

*United States v. W. Elec. Co.*,
900 F.2d 283 (D.C. Cir. 1990)....................19, 20

**Statutes, Rules, and Regulations**

Fed. R. Civ. P. 60(b).................... *passim*

Fed. R. Civ. P. 60(b)(5)....................18

Fed. R. Civ. P. 60(b)(6)....................19

Fed. R. Civ. P. 60(c)(1)....................18

FINRA Rule 2241 ........ *passim*

FINRA Rule 2241(b)(1)........ 12, 14, 15

FINRA Rule 2241(b)(2)........ 14, 23

FINRA Rule 2241(b)(2)(B) ........ 15

FINRA Rule 2241(b)(2)(D) ........ 15

FINRA Rule 2241(b)(2)(G) ........ 12, 15

Notice of Filing of a Proposed Rule Change to Adopt FINRA Rule 2241, 79 Fed. Reg. 69939 (Nov. 24, 2014)........ 13, 14, 15

Order Approving FINRA Rule 2241, 80 Fed. Reg. 43482 (July 22, 2015)........ 13, 14, 20, 22

Order Approving a Proposed Rule Change to Amend FINRA Rules 2210 (Communications With the Public) and 2241 (Research Analysts and Research Reports), 84 Fed. Reg. 43833 (Aug. 22, 2019) ........ 17

Order Approving NASD Rule 2711 and Changes to NYSE Rule 472, 67 Fed. Reg. 34968 (May 16, 2002) ........ 7

**Other Authorities**

GAO, GAO-12-209, Additional Actions Could Improve Regulatory Oversight of Analyst Conflicts of Interest (Jan. 2012), https://www.gao.gov/assets/590/587613.pdf. ........ 16, 21, 22

Press Release, SEC, *SEC, NY Attorney General, NASD, NASAA, NYSE and State Regulators Announce Historic Agreement To Reform Investment Practices; $1.4 Billion Global Settlement Includes Penalties and Funds for Investors* (Dec. 20, 2002), https://www.sec.gov/news/press/2002-179.htm ........ 3

GAO, *Recommendations for Executive Action* (accessed on June 23, 2025), https://www.gao.gov/products/gao-12-209........ 16, 21

*The Impact of the Global Settlement: Hearing Before the Comm. on Banking, Hous., & Urban Affairs*, 108th Cong. 84 (2003), https://www.congress.gov/event/108th-congress/senate-event/LC15759/text ........ 8, 9, 21

## INTRODUCTION

The Defendant broker-dealers in each of the above-captioned matters respectfully request, through the instant Rule 60(b) motion, that this Court approve a modification to a decades-old settlement by terminating certain terms that have outlived their utility.[1] In 2002, securities regulators reached settlements with certain broker-dealers, including Defendants, to address allegations of conflicts of interest related to the firms' equity research analysts and investment bankers. The parties sought court approval of those settlements, and in 2003, Judge William H. Pauley III entered the requested consent decrees. The following year, Judge Pauley entered consent decrees for settlements involving two additional broker-dealers (together with the initial settling firms, the "Settlement Firms"). Each of these settlements—collectively, the "Global Research Settlement" or "Settlement"—are substantively identical in their requirements. The Settlement, through its Addendum A, put in place a series of measures, such as limits on communication between research analysts and investment bankers, designed to protect the objectivity and independence of research analysts. From the outset, those measures were intended to persist only until permanent, industry-wide regulations were put in place. Indeed, and unusually, the Settlement contains explicit language presuming that these measures would be phased out with the adoption and implementation of new industry-wide regulations. That has

[1] We are submitting this motion at the request, and with the specific consent, of each of the Defendant broker-dealers and/or their successors in the above-captioned matters. An identical version of this motion is being filed in each of the above-captioned matters. We note that, in June 2008, JP Morgan Chase & Co. completed its acquisition of The Bear Stearns Companies Inc., and Defendant Bear, Stearns & Co. Inc. no longer exists as a separate entity. In addition, in September 2008, Barclays Capital Inc. acquired certain assets relating to the North American investment banking and capital markets business of Lehman Brothers Inc. and became successor to Lehman for purposes of the settlement at issue here. In March of 2023, UBS Group AG and Credit Suisse Group AG entered into a merger agreement that provided for the acquisition of Credit Suisse Group AG by UBS Group AG. Credit Suisse Securities (USA) LLC, formerly known as Credit Suisse First Boston LLC, deregistered as a broker-dealer with the SEC and FINRA on June 1, 2025.

now happened.  Accordingly, the Defendants believe that the Settlement should be modified by terminating the remaining undertakings in Sections I and II of the Settlement's Addendum A. Additionally, we have been authorized by the staff of the Securities and Exchange Commission ("SEC") to state that the SEC, without necessarily adopting all of the statements in this motion, consents to the relief sought in this motion.

To ensure that the whole industry operates under the same set of rules, and to eliminate now-unnecessary requirements of the Settlement, the Defendants seek an order from this Court that would modify the Settlement by terminating two sections (Sections I and II of Addendum A) that address the same topics as the relevant industry-wide regulation, Financial Industry Regulatory Authority ("FINRA") Rule 2241.

This request follows directly from the plain language of the Settlement, which reflects the parties' expectation that the Settlement would be modified if industry-wide rules were adopted that address the undertakings in Addendum A.  Here, the provisions of Sections I and II of Addendum A are no longer necessary in light of FINRA Rule 2241, which protects investors and research analyst independence through a comprehensive set of principles-based requirements. After FINRA Rule 2241 was implemented in 2015, the Government Accountability Office ("GAO") compared it to the undertakings in the Settlement and confirmed that FINRA had carefully considered the Settlement's terms and codified the provisions that FINRA decided were necessary.  FINRA and the financial services industry have now had more than a decade of experience with Rule 2241, and it is therefore an appropriate time to terminate the now-unnecessary terms of Sections I and II.

Additionally, terminating the remaining provisions of Sections I and II of Addendum A would restore parity to the industry and eliminate the unnecessary burdens imposed on

Settlement Firms and their customers. Specifically, the Settlement Firms—and only the Settlement Firms—face compliance challenges that stem from the differences between the rigid terms of Addendum A and the principles-based requirements of FINRA Rule 2241. For instance, an investment banker at a Settlement Firm cannot ask a research analyst at her firm to pass on administrative details about a research call, even though that action would raise no concerns under Rule 2241. Compliance in scenarios like these should not turn on whether an investment banker happens to work at a firm that entered into a consent decree more than twenty years ago. Accordingly, the Court should approve the requested modification to the Settlement by terminating Sections I and II of Addendum A and subject all broker-dealers to the same industry-wide conflict-of-interest rules.[2]

## BACKGROUND

### I. The Settlement Resolved Conflict-of-Interest Allegations from a Period Before There Were Comprehensive Industry-Wide Rules Addressing the Conduct at Issue.

On December 20, 2002, the SEC, the New York Attorney General, the North American Securities Administrators Association, the National Association of Securities Dealers ("NASD"), and the New York Stock Exchange ("NYSE")[3] (collectively, the "Regulators") announced that they had reached a global settlement with ten large broker-dealers. *See* Press Release, SEC, *SEC, NY Attorney General, NASD, NASAA, NYSE and State Regulators Announce Historic Agreement To Reform Investment Practices; $1.4 Billion Global Settlement Includes Penalties and Funds for Investors* (Dec. 20, 2002), https://www.sec.gov/news/press/2002-179.htm. The

[2] A Proposed Order modifying the Settlement by terminating Sections I and II of Addendum A is attached to Defendant's Notice of Motion. Because Section III of Addendum A has expired on its own terms, Defendants do not seek an order from this Court terminating it.

[3] In 2007, the SEC approved the consolidation of the member firm regulatory functions of the NASD and NYSE Regulation, Inc., a wholly-owned subsidiary of New York Stock Exchange LLC. NASD and the Regulatory Division of the NYSE merged to form FINRA.

announced settlement concluded a joint investigation that the Regulators had begun in April 2002 to investigate conflicts of interest between equity research departments—which provide advice on questions like whether to buy, sell, or hold particular securities—and investment banking departments—which arrange and advise on financial transactions, such as equity offerings and mergers and acquisitions—at the Settlement Firms.

In broad terms, the Regulators alleged that the financial interests of the investment banking side of the firms had compromised the objectivity of the firms' research analysts. *See id.* More specifically, the Regulators alleged that from mid-1999 through mid-2001, the firms' investment banking personnel exerted undue influence on equity research analysts, resulting in research reports that did not reflect the independent and objective views of the analysts. *See* Compl. ¶¶ 10-12, *SEC v. Bear, Stearns & Co., Inc.*, No. 03 Civ. 2937 (S.D.N.Y. Apr. 28, 2003), ECF No. 1.[4] The Regulators claimed that the firms had failed to adequately manage these conflicts. *See id.* ¶ 13.

As part of the Settlement, the parties agreed to request a consent decree from this Court. Accordingly, in April 2003, the SEC filed a series of actions against individual Settlement Firms to seek entry of a final judgment that incorporated the parties' agreement.[5] Each of these cases

---

[4] Unless otherwise noted, all citations to docket entries in this brief are to filings in *SEC v. Bear, Stearns & Co. Inc.*, No. 03 Civ. 2937 (S.D.N.Y.).

[5] *See* Compl., *SEC v. Bear, Stearns & Co. Inc.*, No. 03 Civ. 2937 (S.D.N.Y. Apr. 28, 2003); Compl., *SEC v. J.P. Morgan Sec. Inc.*, No. 03 Civ. 2939 (S.D.N.Y. Apr. 28, 2003); Compl., *SEC v. Lehman Bros. Inc.*, No. 03 Civ. 2940 (S.D.N.Y. Apr. 28, 2003); Compl., *SEC v. U.S. Bancorp Piper Jaffray Inc.*, No. 03 Civ. 2942 (S.D.N.Y. Apr. 28, 2003); Compl., *SEC v. UBS Sec. LLC*, No. 03 Civ. 2943 (S.D.N.Y. Apr. 28, 2003); Compl., *SEC v. Goldman Sachs & Co.*, No. 03 Civ. 2944 (S.D.N.Y. Apr. 28, 2003); Compl., *SEC v. Citigroup Global Markets Inc.*, No. 03 Civ. 2945 (S.D.N.Y. Apr. 28, 2003); Compl., *SEC v. Credit Suisse First Bos. LLC*, No. 03 Civ. 2946 (S.D.N.Y. Apr. 28, 2003); Compl., *SEC v. Morgan Stanley & Co. Inc.*, No. 03 Civ. 2948 (S.D.N.Y. Apr. 28, 2003); and Compl., *SEC v. Merrill Lynch, Pierce, Fenner & Smith Incorporated*, No. 03 Civ. 2941 (S.D.N.Y. Apr. 28, 2003).

was assigned to Judge Pauley. After several months of discussion with the Court and amongst themselves, the parties submitted revised consent decrees. *See SEC v. Bear, Stearns & Co. Inc.*, 2003 WL 22466156, at *1 (S.D.N.Y. Oct. 31, 2003). In October 2003, Judge Pauley entered the parties' proposed consent decrees as final judgments. *See* Judgment, ECF No. 35.[6] He concluded that the proposed settlements were "fair, adequate, and in the public interest," particularly in light of the deferential review courts perform "when the SEC, in its role as *parens patriae,* is one of the settling parties." *Bear, Stearns*, 2003 WL 22466156, at *1-2; *see also id.* at *1 ("[T]he SEC is presumed to represent the interests of the investing public aggressively and adequately[.]") (internal quotation marks and citation omitted).

*A. Substantive Terms of the Settlement*

The settlement agreements reflected in the Final Judgments encompassed both monetary and injunctive relief. Specifically, each settlement imposed civil penalties and required disgorgement; it enjoined the Settlement Firms from engaging in unlawful conduct; and it required compliance with a series of undertakings described in an attachment to the settlement agreements: Addendum A. *See Bear, Stearns*, 2003 WL 22466156, at *1; *see also* Addendum A to Order, ECF No. 32 ("Addendum A"), https://www.sec.gov/files/litigation/litreleases/finaljudgadda.pdf.

Addendum A required the Settlement Firms to make three types of structural reforms. Section I mandated that the firms separate their equity research and investment banking departments. *See* Addendum A at 1. In particular, Section I imposed a "physical separation"

6 On September 27, 2004, Judge Pauley entered final judgments against two additional defendant broker-dealers in the following actions: *SEC v. Deutsche Bank Securities Inc.*, No. 04 Civ. 6909 (S.D.N.Y.) and *SEC v. Thomas Weisel Partners LLC*, No. 04 Civ. 6910 (S.D.N.Y.). The terms of these two settlement agreements are substantially the same as the settlements entered into with the other ten firms.

and information barrier requirement on equity research and investment banking departments, prohibited research analysts from receiving compensation based on investment banking revenues or results, and barred research analysts from being involved in investment banking "pitches" or "road shows." *Id.* at 5-11.

Section II required the Settlement Firms to provide certain general disclosures related to their equity research reports. *See id.* at 11-12. These included standardized language warning investors about potential conflicts of interest, as well as a requirement that firms release details, on a quarterly basis, about the substance of their reports. *See id.* at 12.

Finally, Section III required each Settlement Firm to contract with at least three independent research firms every year, for a five-year period, to ensure that the Settlement Firm's customers had access to objective investment advice. *See id.* at 17-18. Section III further provided that an independent consultant for each Settlement Firm would have final authority to procure independent research. *See id.* at 25. Unlike Sections I and II, Section III automatically expired after five years and therefore is no longer effective today.

*B. Procedure for Modifying the Settlement*

When the parties entered into the Settlement, they recognized that the requirements in Addendum A would be temporary. As noted above, the independent research provisions in Section III expired on their own terms after five years. For the remaining provisions, there was not a hard-and-fast end date; instead, Section II.7 of Addendum A set forth three ways the parties could modify the Settlement in response to future events. First, the parties agreed that if the SEC "adopts a rule or approves an SRO rule or interpretation with the stated intent to supersede any of the provisions of this settlement," then "the SEC or SRO rule or interpretation will govern[.]" Addendum A at 17. Second, the parties agreed that the SEC could provide interpretive guidance on the terms of the Settlement and could join with any Settlement Firm in seeking approval of

modifications to the Settlement—without the involvement of the other financial regulators. *See id.*

Finally, and as relevant here, Section II.7 included language specific to the undertakings in Sections I and II of Addendum A. The parties agreed that:

> With respect to any term in Section I or II of this Addendum that has not been superseded (as set forth above) within five years of the entry of the Final Judgment, it is the expectation of Defendant, the SEC, NYSE, NASD, New York Attorney General's Office and the States that the SEC would agree to an amendment or modification of such term, subject to Court approval, unless the SEC believes such amendment or modification would not be in the public interest.

Addendum A at 17. In other words, the parties set a presumption that, if the terms of Sections I and II were not expressly superseded by an intervening industry-wide rule or interpretation within five years (*i.e.*, by October 2008), then the SEC would agree, subject to court approval, to modify *any and all* of the terms in those sections unless the SEC concluded that such a modification "would not be in the public interest." *Id.*

This presumption made sense in light of the regulatory state-of-play at the time the parties entered into the Settlement. As the investigations into the Settlement Firms were unfolding, then-NASD (which later became FINRA) adopted a new rule, NASD Rule 2711, to address some of the same research analyst conflicts of interest that were under investigation. The SEC approved that rule in May 2002, along with similar substantive changes the NYSE made to its Rule 472 (collectively, "SRO rules"). *See* Order Approving NASD Rule 2711 and Changes to NYSE Rule 472, 67 Fed. Reg. 34968 (May 16, 2002). These new provisions marked the first U.S. regulation applicable to broker-dealers that specifically addressed research analyst conflicts of interest. *See id.* at 34969 (noting that prior rules were "not designed to mitigate the various pressures to which analysts are subject"). By design, the Settlement went further than the SRO rules in restricting the conduct of research analysts. In particular, Addendum A spoke

to a number of activities not specifically addressed in then-NASD Rule 2711 and NYSE Rule 472, like the prohibition on analysts participating in investment banking "pitches" and "road shows."  Together, the SRO rules and the undertakings in Addendum A comprised a broad spectrum of approaches to managing research analyst conflicts of interest.

Section II.7 reflects the parties' understanding that it would take time to sort out which of these approaches worked well and which were unnecessary.  By including three different mechanisms for terminating or otherwise modifying provisions of the Settlement, and by creating a presumption in favor of doing so after five years, *see* Addendum A at 17, the parties made clear that the detailed and particularized rules in Addendum A were not expected to govern forever, even as circumstances changed, but would instead provide interim protections that would give way to a future, industry-wide regulatory framework.

Regulators confirmed this understanding in their contemporaneous testimony.  Shortly after the parties had agreed to the Global Research Settlement, the then-CEO of the NASD testified at a congressional hearing that "while the global settlement is limited both in time and the participants it covers, NASD rules are not limited—they cover the entire brokerage industry—and will form the basic scaffolding for a national system of rules that protect investors, whether they live in Birmingham or Baltimore, Berkeley or Brooklyn."  *The Impact of the Global Settlement: Hearing Before the Comm. on Banking, Hous., & Urban Affairs*, 108th Cong. 84 (2003) ("NASD Chairman & CEO Statement"), https://www.congress.gov/event/108th-congress/senate-event/LC15759/text (statement of Robert Glauber, Chairman & CEO, Nat'l Ass'n of Sec. Dealers).

At the same hearing on the impact of the Global Research Settlement, then-SEC Chairman Donaldson was asked by Senator Sarbanes what the SEC was planning "as it moves

ahead in terms of harmonizing and rationalizing a comprehensive set of rules that apply in this area." *Id.* at 21.  Chairman Donaldson confirmed that regulators were "very much in the process of gearing up . . . to review the rules and the regulations already on the books" and "to take a look at what new rules have to be written[.]"  *Id.*  And he recognized that this rulemaking review would include "looking at the settlement[.]" *Id.*

In sum, the Settlement Firms and the Regulators recognized that the detailed provisions of Addendum A would need to coexist with the new and evolving conflict-of-interest regulations on a temporary basis.  But they shared the expectation that, as regulators took further steps to occupy the field, the requirements reflected in Addendum A would become superfluous—or worse, burdensomely inconsistent with a national system of rules.  The end goal, in other words, was one set of regulations to govern the whole industry.

## II.    Judge Pauley Previously Approved Modifications to the Settlement, Consistent with the Intent of the Parties and the Plain Language of the Settlement.

On two prior occasions, the parties have used Section II.7 to seek—and receive Court approval for—modifications to Addendum A.  First, in September 2004, the parties asked Judge Pauley to make a series of small modifications to the terms of Addendum A in response to unforeseen issues that "came to light as the Settl[ement] Firms attempted to implement the provisions of the Addendum."  Letter dated Sept. 7, 2004, at 1, ECF No. 68 (attached as Exhibit 1).  For example, the parties sought to limit how much information the Settlement Firms needed to publicly disclose about their earnings-per-share forecasts because the firms found significant variance in the content of those forecasts as they tried to implement the Settlement's disclosure requirements.  *Id.* at 6-7.  Judge Pauley granted the parties' request and issued an updated Addendum A reflecting all of the requested revisions.  *See* Order, ECF No. 71 (attached as Exhibit 2).

In 2009, the Settlement Firms filed a Rule 60(b) letter motion asking Judge Pauley to approve more substantial changes to Addendum A that would modify Section I by terminating certain provisions.  *See* Letter dated Aug. 3, 2009, ECF No. 305.

Those changes were needed, the parties agreed, in light of three sets of developments. First, "[s]ince the entry of the Final Judgments, the SEC ha[d] approved various SRO rules and rule amendments that address[ed] many of the same areas as those covered by Sections I and II of the Addendum[.]"  *Id.* at 3.  Included in this bucket were SRO rules restricting investment banking personnel from influencing research analyst compensation, as well as SRO rules prohibiting research personnel from soliciting investment banking business.  *See id.* at 4-6.  In light of the substantive overlap between the SRO rules and Addendum A, the parties agreed that modifying the Settlement by terminating the relevant Addendum A provisions "would be consistent with the public interest[.]"  *See, e.g.*, *id.*

The reason for the second bucket of changes was that experience had made clear that certain provisions of Addendum A "impose[d] additional burdens and costs on the Settl[ement] Firms that no longer appear[ed] necessary to protect investors and/or to effect the policies and principles underlying" the Settlement.  *Id.* at 3.  The parties agreed that abrogating these unnecessary burdens would also "be consistent with the public interest[.]"  *Id.*  For instance, Addendum A required the Settlement Firms to have a dedicated legal and compliance staff for their research departments.  *Id.* at 5.  But by 2009, the firms had "legal and compliance personnel who [were] experienced in monitoring compliance with the Addendum," such that it was "no longer necessary" to have compliance staff who were dedicated solely to a firm's research department.  *Id.*

Finally, the parties also proposed adding language to the modification provision in Section II.7 in light of ongoing regulatory developments.  At the time of the 2009 Rule 60(b) motion, FINRA had "a pending rulemaking initiative with respect to the equity research analyst conflicts of interest rules."  *Id.* at 10 (citing FINRA Regulatory Notice 08-55 (Oct. 14, 2008)). The parties recognized that, if adopted, the new FINRA rules could "further address the remaining areas covered by the Addendum[.]"  *Id.*  Accordingly, they added language clarifying that the SEC would presumptively agree to *further* modifications to Addendum A at the earlier of "one year following . . . Court approval" of the 2009 Rule 60(b) motion or, as particularly relevant here, "the effective date of the new research rules proposed by FINRA in its pending rulemaking initiative, *if such rules address the remaining provisions of the modified Addendum A*."  *Id.* at 10-11 (emphasis added).  Like the initial modification provision in Addendum A, this presumption could be overcome only if the SEC found "that such . . . modification would not be in the public interest[.]"  *Id.* at 11.  In other words, when the parties sought to modify the Settlement in 2009, they expressly contemplated that (1) FINRA would issue new rules governing conflicts of interest between research and investment banking, and (2) the parties would agree to modify Addendum A once such rules were in place.

In March 2010, Judge Pauley approved all of the modifications to Addendum A that the Settlement Firms had requested, including the changes to Section II.7, save for one.  *See* Order, ECF No. 303.  The revised version of Addendum A that he attached to that order is the version that remains in effect today.  *See id.*, Addendum A ("2010 Revised Addendum A," attached as Exhibit 3).  The one modification Judge Pauley declined to make was to terminate certain legal or compliance chaperoning requirements for communications between research analysts and investment banking personnel.  *See* Order at 1-2, ECF No. 303.  Judge Pauley denied this request

because he believed, at that time, that allowing those interactions "would undermine the separation between research and investment banking." *Id.* at 1. He also cited the purpose of the Settlement when it was entered, quoting the testimony of then-Chair Donaldson, who stated that: "To ensure that the separation between investment banking and research is comprehensive, firms will create and enforce firewalls between the two operations reasonably designed to prohibit improper communications between the two." *Id.* at 1-2.

At the time of Judge Pauley's Order, there was no industry-wide SRO rule that required firms "to erect firewalls between research analysts and investment bankers" for conflicts of interest purposes. However, as discussed more fully below, FINRA has since adopted and implemented Rule 2241, which requires firms to do what Judge Pauley was focused on in 2010, namely: "create and enforce firewalls between research and banking" that are reasonably designed to prohibit improper communications between the two. Among other things, FINRA Rule 2241(b) requires firms to "establish information barriers or other institutional safeguards reasonably designed to ensure that research analysts are insulated from the review, pressure or oversight by persons engaged in investment banking services activities" and "establish, maintain and enforce written policies and procedures reasonably designed to identify and effectively manage conflicts of interest related to . . . the interaction between research analysts and those outside of the research department, including investment banking." FINRA Rule 2241(b)(1), (b)(2)(G). These regulatory developments occurred in the years following—and in the shadow of—the concerns that Judge Pauley raised in his 2010 Order. And as with other topics addressed in FINRA Rule 2241, FINRA and the SEC put in place the protections pertaining to the separation between research and investment banking that the regulators determined would be in the public interest. *See infra* at 14.

## III. FINRA Has Issued a Comprehensive Rule Governing Research Analyst Conflicts of Interest, Which Has Effectively Supplanted the Remaining Provisions of Addendum A in the Settlement.

The Regulators' efforts to impose comprehensive, industry-wide standards regarding equity research and investment banking conflicts culminated in 2015, with the SEC's approval of FINRA Rule 2241 (or the "FINRA Rule"). *See* Order Approving FINRA Rule 2241, 80 Fed. Reg. 43482 (July 22, 2015) ("2015 SEC Approval Order"). But what became Rule 2241 actually began as FINRA Regulatory Notice 08-55—*i.e.*, the notice that the parties had pointed to when they asked Judge Pauley to modify Section II.7 in 2009, *see supra* at 10-11. FINRA issued, and received comments on, Regulatory Notice 08-55 in 2008, but did not act on those comments until it proposed Rule 2241 in 2014. *See* Notice of Filing of a Proposed Rule Change to Adopt FINRA Rule 2241, 79 Fed. Reg. 69939, 69951 (Nov. 24, 2014) ("2014 FINRA Notice") ("FINRA responds to the material comments to the Notice Proposal [08-55] below.").

In adopting Rule 2241, FINRA chose to take a different overall approach to regulating conflicts of interest than the one embodied in the Settlement. The Settlement starts from the presumption that interactions between research analysts and investment banking personnel are impermissible unless they are specifically allowed by the Settlement. This makes for a rigid framework that prohibits even benign contacts, unless they happen to fall within one of the express exceptions. By contrast, FINRA Rule 2241 manages conflicts of interest through both a principles-based and prescriptive approach. Section (b) of the FINRA Rule, "Identifying and Managing Conflicts of Interest," illustrates this difference. That section requires firms to "establish, maintain and enforce written policies and procedures reasonably designed to identify and effectively manage conflicts of interest" related to a number of activities: (1) the preparation, content, and distribution of research reports; (2) public appearances by research analysts; and (3) the interaction between research analysts and those outside of the research department, including

not only investment banking personnel, but also sales and trading personnel, covered companies, and customers. FINRA Rule 2241(b)(1). The section further requires firms to establish written policies and procedures that are reasonably designed to "promote objective and reliable research that reflects the truly held opinions of research analysts and to prevent the use of research reports or research analysts to manipulate or condition the market or favor the interests of the member or a current or prospective customer or class of customers." FINRA Rule 2241(b)(2).

The result of this approach is that the FINRA Rule is more comprehensive than the Settlement—because the principles it lays out apply even to conflicts not specifically addressed in the Settlement—while at the same time holding each member firm responsible for designing and implementing policies and procedures needed to effect the FINRA Rule principles and which could accommodate benign interactions between research analysts and investment bankers that are otherwise not expressly permitted (and therefore prohibited) under the Settlement. The adoption of the framework of Rule 2241 reflects FINRA's and the SEC's considered judgment, grounded in more than a decade of experience with evolving SRO rules and the provisions of the Settlement, that a principles-based approach is the appropriate way to manage research analyst conflicts of interest. To that end, both the SEC and FINRA determined that Rule 2241 is "in the public interest" and consistent with investor protection. *See* 2015 SEC Approval Order, 80 Fed. Reg. at 43495 (finding that Rule 2241 "is consistent with section 15A(b)(6) of the [Securities Exchange Act of 1934]," including the requirement that "FINRA's rules be designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, and, in general, to protect investors and the public interest"); 2014 FINRA Notice, 79 Fed. Reg. at 69950 (similar).

Despite the difference in their underlying approaches, the FINRA Rule addresses the same broad set of conflict-of-interest issues that the parties addressed in Addendum A of the Settlement. *Compare* FINRA Rule 2241, *with* 2010 Revised Addendum A at 4-12. At times, the FINRA Rule and the Settlement handle those issues with comparable specificity. For instance, Rule 2241(b)(2)(D) prohibits investment banking personnel from making budgeting decisions for the research department, which matches the prohibition on that conduct in Section I.3 of Addendum A, *see* 2010 Revised Addendum A at 4. Similarly, FINRA Rule 2241(b)(2)(B) requires firms to restrict or limit input by the investment banking department into research coverage decisions, which is akin to the prohibition in Section I.7 of Addendum A, *see* 2010 Revised Addendum A at 5. But consistent with the FINRA Rule's principles-based approach, there are many instances where Rule 2241 allows for interactions that do not implicate investor protection concerns. For example, while the Settlement would prohibit an investment banker from calling an analyst directly to obtain dial-in details for an upcoming public research conference call, FINRA Rule 2241 would allow for this interaction because broker-dealers would be required to implement policies and procedures designed to manage conflicts of interest and insulate analysts from pressure related to these and other banker-analyst interactions. *See* FINRA Rules 2241(b)(1), (2)(G).

As noted above, although the FINRA Rule and Addendum A broadly address the same conflict-of-interest issues, they do not always reach the same result. That is by design, as FINRA carefully considered the provisions of the Global Research Settlement in deciding what to include in Rule 2241. *See* 2014 FINRA Notice, 79 Fed. Reg. at 69940 (explaining that FINRA considered a report that included "a comparison of provisions of the 'Global Settlement'" to SRO rules). GAO, an independent third party, found that the FINRA Rule takes

account of all the remaining provisions of Addendum A. Before FINRA proposed Rule 2241, GAO issued a report examining the "additional actions regulators could take to further address research analyst conflicts." GAO, GAO-12-209, Additional Actions Could Improve Regulatory Oversight of Analyst Conflicts of Interest at 2 (Jan. 2012) ("GAO Report"), https://www.gao.gov/assets/590/587613.pdf. The 65-page report contained just one recommendation: that the SEC "formally assess and document in a recommendation whether any of the Global Settlement's remaining terms should be codified." *Id.* at 42. After FINRA Rule 2241 was adopted, GAO revisited that recommendation and concluded that the Rule "effectively implemented" it "by comparing the Global Settlement's terms with its securities analyst rules and codifying those terms it determined were appropriate." GAO, *Recommendations for Executive Action* (accessed on June 23, 2025), https://www.gao.gov/products/gao-12-209.[7]

As of today, FINRA Rule 2241 has been in effect for nearly ten years. Throughout that time, FINRA has vigorously enforced the Rule.[8] Indeed, FINRA has applied Rule 2241 to

[7] GAO explained that, although its recommendation had been directed at the SEC (rather than FINRA), it would record "the recommendation as implemented by SEC" because "SEC oversees FINRA and approves its rule changes." GAO, *Recommendations for Executive Action* (accessed on June 23, 2025), https://www.gao.gov/products/gao-12-209.

[8] *See, e.g.*, Dawson James Securities, Inc., FINRA Letter of Acceptance, Waiver and Consent No. 2015044393901 (Feb. 7, 2017); Woodside Capital Securities, LLC, FINRA Letter of Acceptance, Waiver and Consent No. 2015043457801 (June 19, 2017); Chardan Capital Markets, LLC, FINRA Letter of Acceptance, Waiver and Consent No. 2017054925801 (July 6, 2020); Citigroup Global Markets, FINRA Letter of Acceptance, Waiver and Consent No. 2017055673701 (Nov. 10, 2020); Sidoti & Company, LLC, FINRA Letter of Acceptance, Waiver and Consent No. 2019061155401 (June 25, 2021); Santander Investment Securities Inc., FINRA Letter of Acceptance, Waiver and Consent No. 2019063972801 (Sept. 7, 2021); Credit Suisse Securities (USA) LLC, FINRA Letter of Acceptance, Waiver and Consent No. 2018059446101 (Jan. 19, 2022); H.C. Wainwright & Co., LLC, FINRA Letter of Acceptance, Waiver and Consent No. 2017055977301 (Sept. 23, 2022); Barclays Capital, Inc., FINRA Letter of Acceptance, Waiver and Consent No. 2019062059301 (Apr. 12, 2024); United First Partners, LLC, Elizabeth Dickerson, FINRA Letter of Acceptance, Waiver and Consent No. 2020065261801 (Mar. 25, 2025).

resolve alleged conflict-of-interest violations with multiple Settlement Firms, whereas the Settlement has never been used for that kind of enforcement.[9] This track record confirms that FINRA has put in place a robust regulatory framework to promote investor protection that *all* industry participants (including the Settlement Firms) must comply with to safeguard the independence and integrity of equity research and maintain separation between their research and investment banking departments.

At the same time, and consistent with its obligations as a self-regulatory organization, FINRA periodically assesses the effectiveness of its rules and may propose new rules or modifications to existing rules. The SEC must review and approve any such new rules or amendments, consistent with its investor protection mandate and pursuant to Congressional statute. For example, in 2019, FINRA proposed (and the SEC approved) minor changes to Rule 2241 regarding research reports on mutual funds and other covered investment funds. *See* Order Approving a Proposed Rule Change to Amend FINRA Rules 2210 (Communications With the Public) and 2241 (Research Analysts and Research Reports), 84 Fed. Reg. 43833 (Aug. 22, 2019).[10] Of course, if FINRA ultimately adjusts its rules to make them more effective or adapt

---

9 *Compare, e.g.*, Docket, *Bear, Stearns*, No. 03 Civ. 2937 (S.D.N.Y.) (no requests to enforce the Settlement), *with, e.g.*, Barclays Capital, Inc., FINRA Letter of Acceptance, Waiver and Consent No. 2019062059301 (Apr. 12, 2024); Morgan Stanley & Co. LLC, FINRA Letter of Acceptance, Waiver and Consent No. 2020067484501 (Aug. 3, 2022); Credit Suisse Securities (USA) LLC, FINRA Letter of Acceptance, Waiver and Consent No. 2018059446101 (Jan. 19, 2022); Citigroup Global Markets Inc., FINRA Letter of Acceptance, Waiver and Consent No. 2017055673701 (Nov. 10, 2020).

10 FINRA also periodically seeks public comments on the effectiveness of its rules. For example, in 2018, FINRA sought comment on whether changes should be made to its research rule governing conflicts of interest and debt research, Rule 2242. *See* FINRA Regulatory Notice 18-05 (Feb. 6, 2018). More recently, FINRA sought public comment on whether certain aspects of Rule 2241 should be adjusted as part of the agency's broader effort to modernize its rules. *See* FINRA Regulatory Notice 25-06 (Mar. 20, 2025).

them to evolving industry practices or technology (consistent with its investor protection mandate), these changes apply to the entire securities industry.

## LEGAL STANDARD

Federal Rule of Civil Procedure 60(b) sets forth the grounds on which a court may grant relief from a final judgment. Under Rule 60(b)(5), a court may modify a final judgment if "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). Where, as here, the judgment at issue is a consent decree, the Second Circuit uses a "flexible standard" in deciding whether to approve a modification. *Patterson v. Newspaper & Mail Deliverers' Union*, 13 F.3d 33, 38 (2d Cir. 1993). Specifically, once a party demonstrates that "there has been a significant change in the circumstances that gave rise to the consent decree," a court's task is only to assess "whether the proposed modification is suitably tailored to the changed circumstances." *Still's Pharmacy, Inc. v. Cuomo*, 981 F.2d 632, 637 (2d Cir. 1992); *see also Horne v. Flores*, 557 U.S. 433, 447 (2009) ("[A] court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'") (citation omitted). This flexible approach to assessing Rule 60(b)(5) motions helps ensure that parties have "an incentive to enter into constructive settlements[.]" *Patterson*, 13 F.3d at 38. If parties know that a consent decree can later be modified to reflect changed circumstances, then "protracted litigation can be avoided and useful remedies [can be] developed by agreement, rather than by judicial command." *Id.*

Motions under Rule 60(b) must be brought "within a reasonable time." Fed. R. Civ. P. 60(c)(1)—a standard that courts apply based on "the particular circumstances of the case." *Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 864 F.3d 172, 182 (2d Cir. 2017). In cases where "reasonable reliance on a judgment is likely to grow over time, a motion to modify it should be made sooner rather than later." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. Wis.*, 769 F.3d 543, 548 (7th Cir. 2014). But in cases like

this one—where a settlement imposes something akin to a "regulatory decree[]"—courts have found that the passage of time can render terms of the settlement "obsolete" in light of subsequent factual or legal developments, such that "the case for modification or rescission actually grows with time[.]" *Id.*; *see also United States v. Paramount Pictures, Inc.*, 2020 WL 4573069, at *3 (S.D.N.Y. Aug. 7, 2020) (granting Rule 60(b) motion to terminate consent decrees in light of "changes in the motion picture industry over the last seventy years" and evolutions in antitrust law that "undermine[d] the Decrees' ongoing regulatory provisions").[11]

## ARGUMENT

### I. Consistent with the Plain Language of the Settlement, and in Light of the Significant Changes to the SRO Rules, the Court Should Modify Addendum A by Terminating the Remaining Terms in Sections I and II.

The text of Addendum A contemplates its eventual obsolescence. It has been "more than five years" since the entry of the Final Judgment in these cases, which means that modifying the Settlement by terminating the remaining provisions of Sections I and II of Addendum A is presumptively appropriate under the plain language of Section II.7. *See* 2010 Revised Addendum A at 15. The case for this modification is even more clear-cut, now that FINRA has adopted "new research rules," *i.e.*, Rule 2241, that "address the remaining provisions of the modified Addendum A." *Id.* Moreover, the SEC consents to such modification. Under these circumstances, the case for modification is straightforward. *Cf. United States v. W. Elec. Co.*,

---

[11] Rule 60(b) also has a "catchall" provision, 60(b)(6), that authorizes courts to modify a judgment "for 'any other reason that justifies relief.'" *Kemp v. United States*, 596 U.S. 528, 533 (2022) (quoting Fed. R. Civ. P. 60(b)(6)). This provision "grants federal courts broad authority to relieve a party from a final judgment 'upon such terms as are just,'" so long as the motion is timely and "is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988). The Supreme Court has explained that Rule 60(b)(6) "provides courts with authority adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice, while also cautioning that it should only be applied in extraordinary circumstances." *Id.* at 863-64 (internal quotation marks and citation omitted).

900 F.2d 283, 305 (D.C. Cir. 1990) ("It is well established that a less demanding standard of review applies to an uncontested motion to modify a consent decree than applies to a contested one.").

Even if the parties had not planned for this eventuality in Addendum A itself, modifying the Settlement by terminating the remaining provisions in Sections I and II would be appropriate given all that has occurred in the more than twenty years since Judge Pauley entered final judgment. As an initial matter, the regulatory developments that culminated in the 2015 adoption of FINRA Rule 2241, constitute "a significant change in the circumstances that gave rise to the consent decree." *Still's Pharmacy*, 981 F.2d at 637. At the time of the conduct that led to the Global Research Settlement, there was nothing approaching the regulatory scheme that now exists to guard against research analyst conflicts of interest. Indeed, the purpose of Addendum A was to put in place concrete structural reforms at a time when industry-wide rules to address research activities were being stood up. In the years since the Global Research Settlement, the SROs have adopted, and the SEC has approved, a comprehensive set of rules and regulations relating to research analyst conflicts of interest that have enhanced investor protection and furthered the public interest. *See, e.g.*, 2015 SEC Approval Order, 80 Fed. Reg. at 43495. Such changes to the "governing law" constitute the kind of "changed circumstances . . . that warrant reexamination of the original judgment." *Horne*, 557 U.S. at 448; *see also Paramount Pictures*, 2020 WL 4573069, at *7 ("[C]hanges in antitrust law and administration have diminished the importance of the [consent] Decrees' restrictions[.]").

In light of these developments, modifying the Settlement to terminate the remaining provisions of Sections I and II is appropriate so long as "the proposed modification is suitably tailored to the changed circumstances." *Still's Pharmacy*, 981 F.2d at 637. Here, it plainly is.

From the outset of the Global Research Settlement, the expectation was always for industry-wide regulation to supplant the Settlement-specific requirements in Addendum A. That is apparent from the text and structure of the original modification provision in Section II.7, *see* Addendum A at 17, and it is reinforced by the revisions to Section II.7 that Judge Pauley approved in 2010, *see* 2010 Revised Addendum A at 15. It also was the position of the regulators in testimony before Congress. *See, e.g.*, NASD Chairman & CEO Statement ("[W]hile the global settlement is limited both in time and the participants it covers, NASD rules are not limited—they cover the entire brokerage industry—and will form the basic scaffolding for a national system of rules that protect investors[.]"). And it was the understanding of GAO that there would be a single regulatory framework that would govern the entire securities industry, which would replace the need for the Settlement (and thereby eliminate the fractured regulatory landscape that exists today). *See* GAO Report at 41 ("But unlike the SRO rules, the Global Research Settlement was not intended to be permanent.").

The provisions of FINRA Rule 2241 fulfill the expectation that industry-wide rules would overtake Addendum A. Rule 2241 broadly addresses the conflict-of-interest issues covered by the remaining provisions in Sections I and II of Addendum A. *See supra* at 13-15. And where the FINRA Rule diverges from Addendum A in the treatment of those issues, it reflects a conscious decision to pursue a different approach. *See supra* at 15-16. As GAO recognized in closing out the one recommendation from its 2012 report, the choices embodied in Rule 2241 demonstrate that FINRA considered the Settlement's terms and codified those terms it determined were appropriate. GAO, *Recommendations for Executive Action* (accessed on June 23, 2025), https://www.gao.gov/products/gao-12-209. And when the SEC reviewed and ultimately approved Rule 2241 in 2015, it determined that FINRA's approach to regulating

conflicts was "in the public interest" and consistent with investor protection. *See* 2015 SEC Approval Order, 80 Fed. Reg. at 43495. That finding has been borne out across more than ten years of enforcement of Rule 2241, such that the Rule—and not the Settlement—has been the tool of choice for resolving conflict-of-interest disputes with the Settlement Firms. *See supra* at 16-17 & nn. 8, 9. Moreover, the SEC consents to this request. That confirms that striking the remaining provisions of Sections I and II of Addendum A would not jeopardize the public interest. *See* 2010 Revised Addendum A at 15.

In sum, the undertakings in Addendum A have served their purpose. And now that Rule 2241 has been in force for more than a decade, it is the appropriate time to excise the now-unnecessary terms of Addendum A. The Court, accordingly, should grant the Defendants' request to modify the Settlement by terminating the remaining provisions of Sections I and II. *See Patterson*, 13 F.3d at 34.

## II. Maintaining a Fractured Regulatory Scheme Would Not Be in the Public Interest Because It Would Impose Unnecessary Burdens and Costs Without Any Corresponding Public Benefit.

FINRA's success in adopting industry-wide rules to manage research analyst conflicts of interest is reason enough to grant Defendants' request. But the flip side of that success is that, so long as a subset of broker-dealers (*i.e.*, the Settlement Firms) remains subject to an additional, partially overlapping set of conflict-of-interest rules, the uniformity and predictability that FINRA Rule 2241 otherwise promises will remain elusive.

Imposing additional regulatory burdens on the Settlement Firms has contributed to issuer and investor confusion, unnecessary duplication and costs, and an unlevel playing field among industry participants who are engaged in exactly the same activity. *See* GAO Report at 34 ("[A]s long as the Global Settlement remains in effect, the Global Settlement firms continue to be

subject to the requirements of the Global Settlement and the SRO research analyst rules, while other firms that provide the same services are subject only to the SRO research analyst rules.").

The friction between the two regulatory approaches is most pronounced when one of the principles-based requirements in FINRA Rule 2241 fails to line up smoothly with the more rigid provisions in Addendum A. For instance, Addendum A prohibits *any* communication between research and investment banking personnel unless the communication expressly falls within a list of exceptions. *See* 2010 Revised Addendum A at 5-9. But FINRA Rule 2241 takes a more balanced, common-sense approach. *See* FINRA Rule 2241(b)(2). As a result, even for communications that could not reasonably pose any relevant conflict of interest under Rule 2241 or other applicable regulations, like the communications described in the examples below, personnel at Settlement Firms must incur additional costs and spend time determining whether a particular communication falls within one of the narrow exceptions in Addendum A.

While the direct costs of these additional administrative and compliance burdens are borne by the firms, the true impact falls on corporate clients and investors, who often find that a particular type of common interaction is acceptable at one firm but not another, simply due to whether the firm is, or its predecessor was, a Settlement Firm.

Consider the following scenarios, all of which are drawn from real-life situations:

- An investor or a corporate client contacts someone they have worked with previously in the investment banking department for dial-in details for an upcoming research analyst call. Under Addendum A, the investment banker is not permitted to reach out to the research analyst directly for even this kind of ministerial information.

- A research analyst is hosting a conference call for a Settlement Firm's customers. On the call, the analyst will interview the management of a company to discuss the company's most recent earnings results. Under Addendum A, an investment banker cannot passively listen in to that call (even in a "listen-only" mode without being identified) to remain current on the company.

- An investor or a corporate client wants to speak to a research analyst about a particular company or industry and contacts a member of the investment banking

department to facilitate an introduction. Under Addendum A, the investment banker is not permitted to make such introduction or even alert the research analyst that the investor or corporate client wants to talk, which may limit the corporate client's access to information.

These scenarios should not play out differently depending on whether the firm at issue was party to a 2003 consent decree that was entered to resolve allegations from before there were comprehensive conflict-of-interest regulations on the books. To the contrary, this fractured approach adds unnecessary costs and confusion without any commensurate benefit. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992) (explaining that modification of a consent decree is appropriate when "enforcement of the decree without modification would be detrimental to the public interest"). Modifying Addendum A to terminate the remaining provisions of Sections I and II, and relying instead on the provisions of FINRA Rule 2241 and any other industry-wide rules, would provide needed clarity and reestablish a level playing field for the industry and investment community.

## CONCLUSION

For the foregoing reasons, the Defendants ask this Court to grant their Rule 60(b) motion and approve their proposed modification of Addendum A by terminating the remaining provisions of Sections I and II, as reflected in the proposed order accompanying Defendants' Notice of Motion. [12]

---

[12] Defendants understand that the proposed order to be submitted by two other Settlement Firms—in *SEC v. U.S. Bancorp Piper Jaffray Inc.*, No. 03 Civ. 2942 (S.D.N.Y.), and *SEC v. Thomas Weisel Partners LLC*, No. 04 Civ. 6910 (S.D.N.Y.)—differs modestly in form, but not in substance, from the proposed order Defendants have filed here. The underlying judgments across the Settlement Firm cases are slightly different in form. Our proposed order conforms to the text of our judgments and tracks the terms of the modification provisions of the settlement by requesting that the Court terminate the remaining provisions of Sections I and II of Addendum A. We understand that the other proposed order will ask the Court to strike the provision in the Final Judgment requiring adherence to Addendum A. Because our proposed order would remove all the provisions of Addendum A with any remaining effect, the practical result of both

Dated: December 5, 2025

Respectfully submitted,

*<u>/s/ Stephanie Avakian</u>*
Stephanie Avakian
Stephanie Nicolas
Michael Baer (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20037
Telephone: (202) 663-6000
stephanie.avakian@wilmerhale.com

Peter G. Neiman
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
peter.neiman@wilmerhale.com

*Attorneys for Defendants*

orders would be the same: the Settlement Firms would no longer be bound by the undertakings in Addendum A. Accordingly, we leave to the Court the choice of how best to proceed, and we note that if the Court were to prefer the form proposed in the two other cases, the particular section the Court would need to strike would vary across the Final Judgments.

**CERTIFICATE OF COMPLIANCE**

I, Stephanie Avakian, hereby certify pursuant to Local Civil Rule 7.1(c) that the foregoing memorandum of law was prepared using Microsoft Word and contains 8,105 words.

*/s/ Stephanie Avakian*
Stephanie Avakian